AB:JRS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH AND SEIZURE WARRANT FOR A SILVER AUDI CAR, WITH NEW YORK STATE LICENSE PLATE HAP-8552, WHICH IS REGISTERED TO RICHARD D. SCHIRRIPA, AND ANY CLOSED CONTAINERS/ITEMS CONTAINED THEREIN, AND ANY ONBOARD COMPUTER/NAVIGATION SYSTEM CONTAINED THEREIN | **Agent Affidavit in Support of Application for Search and Seizure Warrant**<br><br>**No. 20-MJ-307** |

EASTERN DISTRICT OF NEW YORK) ss.:

ANTHONY NAPOLI, being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1.       I am a Task Force Officer with the Department of Homeland Security—Homeland Security Investigations ("HSI").  As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), i.e., a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I have worked for the New York City Police Department for approximately 15 years, and for the last three, I have been a Task Force Officer assigned to HSI—New York's Dark Web/Virtual Currencies Task Force.  During that time, I have participated in investigations targeting individuals engaged in complex financial fraud schemes, computer fraud, computer hacking, and money laundering, among other things.  As a Special Agent, I have received training and have conducted and participated in surveillance, the execution of search and seizure warrants,

2019.11.19

and the review of electronic devices and communications for electronically stored information ("ESI"). I have received training regarding computer fraud and computer hacking.

2. I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises specified below (the "Subject Premises") for, and to seize, the items and information described in Attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. All dates are on or about the date specific. All amounts are approximate.

**B. The Subject Premises**

3. The Subject Premises are particularly described as a four-door silver Audi car, with New York State license plates HAP-8552, which is registered to Richard D. Schirripa, and any closed containers/items contained therein, and any onboard computer/navigation system contained therein (the "Subject Premises"):

 

2019.11.19

### C.  The Subject Offenses

4.      For the reasons detailed below, I believe that there is probable cause to believe that the Subject Premises contain evidence, fruits, and instrumentalities of violations of Title 50, United States Code, Sections 4512 and 4513 (the Defense Production Act), which prohibits any person from willfully accumulating designated scarce materials "(1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices."  In this case, as explained below, there is probable cause to believe that Richard Schirripa, a licensed pharmacist, is (1) hoarding personal protective equipment designated by the President as scarce, including N95 facemasks (both surgical-grade masks and commercial masks); and (2) reselling such equipment significantly above prevailing market prices—i.e., Schirripa is exploiting the present COVID-19 pandemic and engaging in price gouging (the "Subject Offenses").

## II.  Probable Cause[1]

### A.  Probable Cause Regarding Subject's Commission of the Subject Offense

<u>The COVID-19 Pandemic</u>

5.      A novel coronavirus—COVID-19—first emerged in Wuhan, China in late 2019.  It causes severe acute respiratory syndrome.  COVID-19 is infecting people and spreading easily from person-to-person.  It has since infected more than 1 million people in more than 100 countries, and has caused more than 70,000 deaths.  The first confirmed case of COVID-19 in the United

---

[1]  A search warrant for the Subject Premises was previously sworn out in the Southern District of New York on April 9, 2020, which warrant was authorized by the Honorable James L. Cott, United States Magistrate Judge.  However, this warrant request is slightly different. For instance, in yesterday's application, the Government did not request—and the warrant did not authorize—a search of the car's computer/navigation system.  Yesterday's warrant has not been executed at this time.

2019.11.19

States was in January 2020.  By early March, COVID-19 had reached New York State.  According to the New York State Department of Health website, as of April 7, 2020 New York State has more than 138,000 cases of COVID-19; New York City is now the epicenter of this global public health crisis.  In March 2020, the World Health Organization declared COVID-19 a pandemic, and the President of the United States declared a national emergency.  On or about April 3, 2020, the Center for Disease Control and Prevention recommended the use of cloth face coverings in public, recommending that surgical masks and N95 respirators be reserved for healthcare workers and other medical first responders.

The Defense Production Act

6.     As relevant here, the Defense Production Act prohibits any individual from accumulating <u>designated scarce materials</u> "(1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices."  50 U.S.C. § 4512.  A "willful" violation is a misdemeanor.  50 U.S.C. § 4513. The statute explicitly states that "the President" has authority to designate materials as scarce.  50 U.S.C. § 4512.

March 25, 2020 Designation Order

7.      On or about March 25, 2020, the Department of Health and Human Services announced the issuance of a Notice under Executive Order 13910 ("Executive Order") and section 102 of the Defense Production Act of 1950 (the "Act"), 50 U.S.C. § 4512, as amended, designating health and medical resources necessary to respond to the spread of COVID-19 that are scarce or the supply of which would be threatened by excessive accumulation (the "Designated Materials").

8.     The Designated Materials include, but are not limited to, N95 Filtering Facepiece Respirators, Personal Protective Equipment ("PPE") face masks, PPE surgical masks, PPE face

4

shields, PPE gloves or surgical gloves, ventilators, medical gowns or apparel, and disinfecting devices.

## Richard Schirripa

9.      In early April 2020, HSI received a tip that Richard Schirripa was allegedly selling bulk PPE, at inflated prices throughout the New York area.  This equipment reportedly included thousands of surgical and N95 masks used in the medical field.  The individual who supplied the tip provided Schirripa's phone number.

10.     Based on, among other things, my review of the New York State Education Department website, I am aware that the target subject, Richard Schirripa, is a licensed pharmacist. He became licensed on or about December 21, 1979; his license is active until January 2022.

11.     Based on, among other things, my review of New York State Department of State incorporation records, I am aware that Madison Avenue Pharmacy, Inc. is a registered New York State corporation, whose address is listed as 1407 Madison Avenue, New York, NY 10029.  The CEO of Madison Avenue Pharmacy is listed as Richard Schirripa, at the same address.

12.     I have reviewed screenshots of a LinkedIn profile associated with "Richard Schirripa."  It contains a photograph of him (the "Profile Picture") and it lists his title as "CEO at Madison Avenue Pharmacy."

13.     Based on my review of publicly available information, I am aware that in or around 2013, Richard Schirripa and Madison Avenue Pharmacy settled a civil case with the U.S. Attorney's Office in the Southern District of New York.  As part of the settlement, Schirripa and Madison Avenue Pharmacy admitted responsibility for numerous violations of the Controlled Substances Act and agreed to pay $200,000 in civil penalties and to implement enhanced compliance procedures.

2019.11.19

<u>The Undercover Call to Richard Schirripa</u>

14.     On or about April 4, 2020, another HSI Special Agent, acting an undercover capacity (the "UC") placed a recorded telephone call to the phone number supplied by the individual who gave the original tip about Schirripa.  The individual who picked up identified himself as "Rich" and referred to himself as "Rich Madison Avenue Pharmacy."  During the recorded call, which lasted longer than ten minutes, "Rich" and the UC discussed a transaction involving masks.  "Rich" said that the surgical grade N95 masks were $22 per mask, while the commercial grade N95 masks cost $150 for ten masks (*i.e.*, $15 per mask).  During the call, "Rich" said the following, in sum and substance, and among other things:

- "I had purchased them after the gouging took place, so the price – my masks are very expensive, but you can't get them."

- "The masks I have, I bought prior to the outbreak in the US. When it hit China, I went out to get large quantities and unfortunately I paid very high for them, but you know something, when you have something no one else has, it's not a high price."

- "I used to sell a box of these for like $20, now it's like $15 a mask."

- "We're in a time of emergency and shortage."

- "I'd like to just do it one shot.  You need one box?  Fine.  You need ten boxes?  Fine.  I just want to do it in one shot."

- "I have a very large quantity.  I spent over $200,000 on masks."

- Referring to Mt. Sinai Hospital: "It's a freaking war zone.  It's fucking crazy."

- "My office is on 97th and Madison, right next to Mt. Sinai."

- "The bottom line is that if you get an order together, I will bring some extra ones to the city. If you find out your quantity, just give me an idea so I can know how many to bring.  I can only fit a thousand masks in my car.  And I got a lot of . . . shit, I gotta bring a thousand for a nursing home tomorrow."

- "I'll be at my office Monday and probably Wednesday.  So what you need to do is find out how many you need and include anyone over 60 relative wise, and essential workers like nurses, and any of your girlfriend's affiliates or

2019.11.19

associates and um . . . text me your name and address so I can generate a bill. So I would rather just sell them to you, and you to sell it to them at the price I give you. If you can do that then I have no problem because I don't want any price gouging associated with this."

- "My name is Rich, Madison Avenue Pharmacy."

- "I'm a pharmacist.  My pharmacy license is still active."[2]

Based on my training, experience, and involvement in this investigation, I am believe that, during this recorded call, "Rich":

  a.  Expressed keen awareness of the concept of price gouging ("I had purchased them after the gouging took place"; "I don't want any price gouging associated with this.");

  b.  Stated that he had a very large quantity of PPE, including masks ("I went out to get large quantities"; "I have a very large quantity.  I spent over $200,000 on masks.");

  c.  Admitted that he bought a large quantity after COVID-19 emerged in China, but before it arrived in the United States ("The masks I have, I bought prior to the outbreak in the US.  When it hit China, I went out to get large quantities");

  d.  Admitted that his prices were extremely high compared to typical market price ("I used to sell a box of these for like $20, now it's like $15 a mask");

  e.  Expressed his awareness of the present health crisis ("We're in a time of emergency and shortage"; "It's a freaking war zone" at Mt. Sinai Hospital); and

  f.  Asserted that he could charge a premium because of the shortage of supply ("when you have something no one else has, it's not a high price").

---

[2] During the conversation, "Rich" also asked the UC if the UC was an essential worker and informed the UC—who claimed to work in "Fintech" doing essentially IT work—that IT communications was "essential."

2019.11.19

<u>Physical Surveillance of Richard Schirripa—April 6 and 7, 2020</u>

15.     Based on my involvement in this investigation, I am aware that law enforcement conducted physical surveillance of Richard Schirripa on both April 6 and April 7, 2020.  On each day, as agents observed Schirripa engage in hand-to-hand transactions consistent with his repeated bulk sale of PPE, including masks.

16.     Specifically, based on my involvement in the April 6 surveillance, as well as my conversations with other law enforcement officers and my review of photographs and videos taken during surveillance, I am aware of the following, among other things, relating to the events of April 6, 2020:

a.     At approximately 1:14 PM, Schirripa exited 1410 Madison Avenue, New York, NY via the residential door.  He had with him two large paper shopping bags.  He was wearing a N95 mask, black T-shirt, and dark color khakis with black dress shoes.  Schirripa walked to his car—a Silver Audi with NY License plate HAP-8552 (the Subject Premises). Schirripa opened the trunk of the Subject Premises and agents observed multiple boxes inside. Schirripa closed his trunk and entered the Tre Otto restaurant located next to 1410 Madison Avenue.  A few minutes later, Schirripa walked back to the Subject Premises.  He took a brown bag out of the Subject Premises and moved it to the front seat. He then walked back into 1410 Madison Avenue, New York, NY.

b.     At approximately 1:24 PM, Schirripa exited 1410 Madison Avenue, New York, NY and walked to the Subject Premises again.  Agents observed Schirripa at the front passenger seat of the Subject Premises with a large brown bag, plastic bag and wearing a backpack. Schirripa entered the Subject Premises and proceeded to drive northbound on Madison Avenue. Schirripa stopped on Madison Avenue between East 106th and 107th Streets.  Schirripa grabbed

2019.11.19

his backpack from the passenger seat.  An unknown male wearing a mask and a red shirt covered by a doctor's white coat ("UM-1") approached Schirripa.  UM-1 had a conversation with Schirripa through the driver's window.  Schirripa handed UM-1 a manila folder through the drivers' side window.  Schirripa appeared to give UM-1 a package or box.  UM-1 placed it under his arm, waved, and walked into a building.

    c.  At approximately 1:36 PM, Schirripa turned onto East 107th Street.  At approximately 1:40 PM, Schirripa pulled over to the side of the road and exited the Subject Premises with two large tote bags containing boxes.  He entered 1261 5th Avenue, Lotts Residence Assisted Living/Vista.  Shortly thereafter Schirripa exited the building, returned to the Subject Premises, and opened his trunk—which agents observed was full of boxes.  Schirripa then closed his trunk, opened a car door, and took out more large tote bags containing boxes. Agents observed Schirripa speaking with an unknown woman who was wearing a black mask and black pants with a floral shirt and a name tag covered by a sweater ("UW-1").  UW-1 carried the tote bags containing boxes and a folder inside the building. Schirripa got back into the Subject Premises and pulled out on to 5th Avenue.

    d.  At approximately 2:14 PM, Schirripa made a right-hand turn onto East 119th Street, where he pulled over to the side of the road. Agents observed Schirripa giving a bag to an unknown male in the vicinity of 274 East 119th Street.  Schirripa then drove away, with agents continuing to follow.

    e.  At approximately 2:18 PM, Schirripa pulled over to the side of Frederick Douglas Blvd, in the vicinity of Drug Shoppe Pharmacy located at 2704 Frederick Douglas Blvd. An unknown female ("UF-1") wearing a white coat, black mask, and black pants exited Drug Shoppe Pharmacy and approached Schirripa.  Schirripa handed UF-1 a manila envelope and she

2019.11.19

walked away. UF-1 returned with something in her hand. Schirripa opened the trunk of the Subject Premises and they conversed. Agents observed the trunk filled with boxes. Schirripa closed the trunk, and appeared to be having an argument with UF-1. UF-1 made hand gestures, raised her hands, and pointed two fingers at Schirripa. Schirripa returned to the Subject Premises and drove away, and UF-1 returned to the Drug Shoppe Pharmacy.

        f.     At approximately 2:46 PM, Schirripa pulled over in front of 1212 5th Avenue near East 102nd Street. Schirripa got out of the Subject Premises and opened the car doors. Agents observed Schirripa unloading boxes from the Subject Premises. An unknown woman with a scarf and carrying a paper bag ("UF-2") was observed talking with Schirripa. Schirripa and UF-2 engaged in conversation, and Schirripa showed UF-2 an open box of masks. Schirripa returned to the Subject Premises and drove away; UF-2 entered a building on Fifth Avenue.

        g.     At approximately 3:00 PM, in the vicinity of 97th and 98th and Madison Avenue, Schirripa was seen moving bags and boxes around from the trunk of the Subject Premises to the passenger seat. Schirripa took out a backpack and entered 1410 Madison Ave, New York, NY.

        h.     At approximately 3:23 PM, Schirripa exited 1410 Madison Ave, New York, NY with same backpack he entered with and headed to the Subject Premises. Schirripa was observed walking up to an unknown male, handing him a mask from a box, and showing him how to put the mask on. He brought the box back to the Subject Premises. He is not believed to have returned to 1410 Madison Avenue that day.[3]

---

[3] On April 7, 2020, Schirripa was observed meeting several individuals in Long Island.

2019.11.19

Events of April 8, 2020

17.     Based on my involvement in this investigation, including my conversations with the UC, I am aware that, on or about April 8, 2020, the UC and "Rich" exchanged text messages, in which "Rich" reiterated the price of masks previously discussed ($150 for a box), and said—upon being asked—that he would try to get gloves as well, if he could.  "Rich" also inquired as to the type of gloves requested (latex, vinyl, powder, powder-free, sizes, etc.).

18.     During follow-up recorded phone calls on April 8, 2020, they discussed meeting up in the city for a transaction involving PPE, and they discussed payment details using Venmo.  The UC requested approximately 15 boxes of masks but was not sure as to which type of mask; "Rich" indicated, in sum and substance, that before they met, he would need to return to Long Island to retrieve that quantity of each type of mask.  During the course of these conversations, Schirripa stated that he was selling some of these masks at a 10% markup—specifically, that he had purchased some of these masks at $20, and was reselling those at $22.  During their communications on April 8, 2020, Schirripa and the UC agreed to do a transaction the following day (April 9, 2020) at 1410 Madison Avenue in Manhattan.

19.     In or around the late afternoon, an agent conducting surveillance in the vicinity of Schirripa's Long Island residence saw Schirripa (1) bring one box from the Subject Premises into that residence on one occasion, and (2) bring one box from that residence to the Subject Premises on another, before Schirripa drove (using the Subject Premises) to a FedEx facility in Long Island and dropped off several packages there.[4]

---

[4] This agent ("UC-2") was conducting surveillance in a U.S. Postal Service vehicle in the vicinity of the Subject Premises.  Schirripa approached UC-2 and said, in sum and substance, "I'm Rich Schirripa, I live here, where the fuck is your mask?"  UC-2 and Schirripa engaged in a brief conversation, in which UC-2 stated that he was not the usual postman for that street.  Schirripa

11

<u>Events of April 9, 2020</u>

20.     Based on my involvement in this investigation, including my conversations with other law enforcement officers, I know that Richard Schirripa met with the UC on April 9, 2020 on Madison Avenue in the vicinity of 97th and 98th Streets.  This meeting was recorded.  Based on my conversation with the UC, I understand that the following transpired, among other things:

a.      Schirripa sold approximately 16 boxes of masks to the UC for approximately $2,690.  Specifically, he sold (1) 15 boxes of N95 commercial grade masks (referred to as 8511s) for $150 per box (each box has 10 masks), and (2) one box of N95 surgical grade masks (referred to as 1860s) for $440 for a box of 20 masks.

b.      When they originally met, Schirripa and the UC were parked on opposite sides of Madison Avenue.  The UC walked over to Schirripa and Schirripa told the UC to square the block and pull up next to Schirripa's car (the Subject Premises).  Schirripa added, in sum and substance and in part, "I don't want anyone to see the stuff—this stuff is like gold right now, someone's gonna break into my car."

---

handed him two masks—one for UC-2, and one for the usual postman.  Notably, while being surveilled the prior day (April 7), Schirripa had engaged in suspected counter-surveillance by turning onto a side-street on Long Island, instead of continuing to use a main road.  The area of Long Island in which he resides is not densely populated and fewer cars than usual are on the road due to COVID-19.  Also on the prior day (April 7), two agents were conducting surveillance of Schirripa outside of 1410 Madison Avenue.  Schirripa double-parked right next to their undercover vehicle.  At one point, when Schirripa was inside a restaurant/bar on the first floor of the building, agents looked into his car and saw boxes.  Shortly thereafter, Schirripa came outside and struck up a conversation with one agent, who was standing outside.  Schirripa asked, in sum and substance, "Hey man, where's your mask?"  The agent said, in sum and substance, "I don't have one, you selling them?"  Schirripa asked, "Are you hospital personnel?"  The agent said he was not.  Schirripa said, in sum and substance, that he could not sell to anyone who was not hospital personnel, but pointed towards a mart at the end of the street, where he said they might be selling masks.

2019.11.19

c.       At one point during their conversation, Schirripa said, unprompted, in sum and substance: "I feel like a drug dealer standing out here."

d.       At another point during their conversation, Schirripa said that his supplier is in Florida.  He added that the wholesalers who provided these masks to his supplier are price gouging, and he implied that these masks were originally obtained on "the black market."

e.       Schirripa said that he normally buys the surgical grade masks for $20 per box and sells for them $40, but he said he had purchased these for $400 per box.

f.       The UC was able to see into Schirripa's car (the Subject Premises), which was packed with boxes in both the backseat and the trunk.

g.       Schirripa said he lived on Long Island but had an apartment in the city, and he pointed to a particular window at 1410 Madison Avenue.  Schirripa also said he leased the space at 1407 Madison Ave. from Mt. Sinai Hospital.

h.       Schirripa supplied an invoice for the purchase, which referenced his office address—1410 Madison Avenue, Apt. 4S, New York, New York.

i.       As for payment, the UC attempted to complete a Venmo transaction, but the transaction would not go through (potentially because the dollar amount was too large).  Schirripa told the UC to pay him by tonight, and the UC agreed (and was permitted to keep the boxes of PPE).  Later that day, the UC again met up with Schirripa and paid him in cash for the 16 boxes; I understand that this meeting, too, was recorded.

21.     Based on the facts set forth above, as well as my training and experience, I respectfully submit that there is probable cause that Richard Schirripa has both hoarded PPE, and engaged in price gouging in his sales of PPE.  This is evident from the quantity of transactions he engaged in, the apparent PPE in his vehicle, the Subject Premises (including the trunk), his own

2019.11.19

statements about the quantity of PPE he purchased on the recorded UC call, the prices he offered to sell the UC masks at ($22 and $15, respectively), and the pre–COVID-19 prices he referenced.

**B.  Probable Cause Justifying Search of the Subject Premises**

22.     As noted above, Richard Schirripa (1) emphasized that he bought a large quantity of PPE after COVID-19 emerged in China but before it arrived in the United States; (2) offered to sell PPE at significantly inflated prices on a recorded call; (3) repeatedly engaged in apparent sales of PPE out of the Subject Premises; (4) had various boxes in the trunk of the Subject Premises, which appeared to be additional PPE; and (5) completed the sale with the UC, with PPE he removed from the Subject Premises.  Given the foregoing, there is probable cause that the Subject Premises will contain fruits and evidence of his crime, such as purchase orders, receipts, PPE including masks, crime proceeds, and information about the pickup and shipment addresses for the Designated Materials.

23.     There is also probable cause that the Subject Premises is currently in this District. On or about April 9, 2020, the Honorable Cheryl L. Pollak, Chief United States Magistrate Judge for the Eastern District of New York, authorized a search warrant of Schirripa's residence on Long Island (9 Marirod Ct, Fort Salonga, New York 11768), as well as the electronics therein.  While executing that search warrant this morning, agents observed the Subject Premises parked in the driveway of Schirripa's residential address in Long Island—the address to which the Subject Premises is registered.

**C.  Probable Cause Justifying Search of ESI**

24.     Based on my training, experience, and involvement in this investigation, including my conversations with officer law enforcement officers, I know that individuals who engage in hoarding and price gouging commonly use electronic devices in connection with their misconduct,

such as ordering goods, including on the dark web; communicating with suppliers and purchasers online; keeping track of suppliers' or purchasers' contact information; and keeping a record of transactions or criminal proceeds for future reference.  As a result, they often store data on their electronic devices related to their illegal activity, which can include email correspondence; purchase orders; receipts; logs of online "chats" with suppliers or purchasers; contact information of suppliers or purchasers, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts; and/or records of illegal transactions or the disposition of criminal proceeds.

25.    Based on my training, experience, and involvement in this investigation, including my conversations with officer law enforcement officers, I also know that the Subject Premises contains a computer/navigation system within it—a system that contains location information and may also contain communication information (depending on how the driver uses it), such as call records, text message records, Bluetooth information, and information about the cellphone(s) that accessed it.  There is probable cause to search this computer/navigation system information, as well; such information is likely to contain information about where and when Schirripa engaged in sales of PPE; who Schirripa's supplier(s) and purchasers were; what Schirripa said to additional customers and supplier(s); the prices Schirripa charged others; and where any additional locations are where he may store additional PPE.  This computer/navigation system information is requested only for the period of December 1, 2019 through the present.[5]

---

[5]  As noted above, a search warrant for the Subject Premises was previously sworn out in the Southern District of New York on April 9, 2020.  However, the Government did not request—and that warrant did not authorize—a search of the car's computer/navigation system. That warrant has not been executed at this time.

2019.11.19

26.     Based on my training and experience, I also know that, where computers are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred.  This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on a home computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

- In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data.  In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

27.     Based on the foregoing, I respectfully submit there is probable cause to believe that Richard Schirripa is engaged in hoarding of PPE and price gouging in his sales of PPE, and that evidence of this criminal activity is likely to be found in the Subject Premises and on computers and electronic media found in the Subject Premises.

## III.  Procedures for Searching ESI

### A.  Execution of Warrant for ESI

28.     Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review."  Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport

2019.11.19

them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

## B.  Review of ESI

29.     Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

30.     In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

17

2019.11.19

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[6]; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

31.     Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.   Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

### C.  Return of ESI

32.     If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of

---

[6] Keyword searches alone are typically inadequate to detect all relevant data.  For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text.  Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

2019.11.19

the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

## IV. Conclusion and Ancillary Provisions

33. Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

ANTHONY NAPOLI
Task Force Officer
Department of Homeland Security

Sworn to me through the transmission of this
Affidavit by reliable electronic means,
pursuant to Federal Rules of Criminal Procedure
41(d)(3) and 4.1 this 10th day of April, 2020

*Cheryl Pollak*

THE HONORABLE CHERYL L. POLLAK
CHIEF UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

19

2019.11.19

## ATTACHMENT A

### I.  Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows: a four-door silver Audi car, with New York State license plates HAP-8552, which is registered to Richard D. Schirripa, and any closed containers/items contained therein, and any onboard computer/navigation system contained therein:

 

### II.  Items to Be Seized

#### A.  Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises consist of the following evidence, fruits, and instrumentalities of violations of Title 50, United States Code, Sections 4512 and 4513 (the Defense Production Act), which prohibits any person from willfully accumulating designated scarce materials "(1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices." Here, there is probable cause to believe that Richard Schirripa, a licensed pharmacist, is (1) hoarding personal protective equipment ("PPE") designated by the President as scarce, including N95 facemasks (both surgical-grade masks and commercial masks); and (2) reselling such equipment significantly above prevailing market prices—*i.e.*, Schirripa is exploiting the present COVID-19 pandemic and engaging in price gouging (the "Subject Offenses"), described as follows:

1.  Evidence concerning occupancy or ownership of the Subject Premises, including without limitation, identification documents, the car's registration, mail envelopes, bills, addressed correspondence, diaries, statements, address books, telephone directories, and keys.

2.  PPE, such as N95 facemasks (both surgical-grade masks and commercial masks).

3.  Purchase orders and receipts for PPE, such as N95 facemasks (both surgical-grade masks and commercial masks).

4.  Documents or records containing information about sellers and buyers of PPE, and information about the pickup and shipment addresses for transactions involving PPE.

5.  Documents or records containing financial information about sales and purchases of PPE.

2019.11.19

6.      Proceeds of sales of PPE.

7.      Communications with suppliers, sellers, and buyers of PPE, as well as communications with potential suppliers, potential sellers, and potential buyers of PPE.  These communications include cellphone information, such as call records and text messages, that are stored on the Subject Premises' computer/navigation system, for the period from December 1, 2019 through the present.

8.      Location information of the Subject Premises between December 1, 2019 and the present, based on the Subject Premises' computer/navigation system.

9.      Between December 1, 2019 and the present, information regarding all cellphones that were connected to, plugged into, accessed, or used the Subject Premises' computer/navigation system, such as the make/model information of those phones, the phone numbers of those phones, the IMEI or ESN of those phones, the name(s) of those phones, and Bluetooth information.

**B.   Search and Seizure of Electronically Stored Information**

The items to be seized from the Subject Premises also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners.  In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

Included within the items to be seized from the Subject Premises are:

1.      Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.      Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.      Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

**C.   Review of ESI**

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

3

2019.11.19